**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**July 23, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ELIGIUS MONTANO,

    Defendant - Appellant.

No. 23-2030

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:22-CR-00894-KWR-2)**
_____

Violet Edelman, Assistant Federal Public Defender (Martín Juárez, Assistant Federal Public Defender, on the briefs), Office of the Federal Public Defender, District of New Mexico, Albuquerque, New Mexico, for Defendant – Appellant.

Jaymie L. Roybal, Assistant United States Attorney (Alexander M.M. Uballez, United States Attorney, with her on the briefs), Office of the United States Attorney, District of New Mexico, Albuquerque, New Mexico, for Plaintiff – Appellee.
_____

Before **ROSSMAN**, **KELLY**, and **MURPHY**, Circuit Judges.
_____

**MURPHY**, Circuit Judge.
_____

## I.    Introduction

In 2022, Eligius Montano pleaded guilty to robbing a Metro PCS store in

Belen, New Mexico. At sentencing, the district court applied two relevant guidelines

enhancements: an increase in his offense level pursuant to U.S.S.G. § 2B3.1(b)(2)(E) for creating the impression he was holding a firearm under his sweatshirt during the robbery; and an endangerment adjustment pursuant to U.S.S.G. § 3C1.2 for inducing his getaway driver to navigate recklessly. In calculating Montano's criminal history, the district court noted that each of five consolidated state cases, which were resolved in a single judgment with one overarching sentence, included a charge or charges with possible prison terms exceeding thirteen months. As a result, the district court assigned each case the maximum three criminal history points pursuant to U.S.S.G. § 4A1.1(a).

Montano appeals, challenging the correctness of each of the district court actions summarized above. Given the available evidence, this court concludes the district court did not err in its application of § 2B3.1(b)(2)(E) or in calculating Montano's total offense level in § 3C1.2. The evidence, however, did not support the district court's attribution of three criminal history points to each of the five state cases. Thus, exercising jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, this court **remands** the matter to the district court with directions to vacate the judgment and resentence Montano considering an advisory sentencing range calculated by reference to a criminal history category of V.

## II.     Background

### a.  Factual History

On April 18, 2022, Montano and his father, Daniel Montano ("Daniel"), robbed a Metro PCS store in Belen, New Mexico. Two clerks were working when

2

Montano and Daniel entered the store. Montano and his father shouted at the employees to "put your hands where we can see them" and directed them to "get against the wall." One clerk testified both men had their hands positioned in their sweatshirts to create the impression they were holding firearms. Despite the clerk's belief and fear that a gun was present, further investigation revealed neither Montano nor Daniel possessed a weapon at the scene. After gaining control of the clerks, Montano guarded the front of the store while Daniel ushered one of the clerks around the store to facilitate the theft of various electronics. Shortly thereafter, the men left the store with a garbage bag containing roughly $8000 in merchandise. Following the Montanos' departure, the clerks immediately contacted the police.

As Montano and his father exited the store, the Metro PCS district manager happened to be traveling to the Belen franchise in her vehicle. As she approached the location, she witnessed the duo walk behind the store with a trash bag and enter a red Toyota, which had pulled up to meet the men. The driver of the vehicle was later revealed to be Jennah Payne, Daniel's girlfriend. The manager was able to follow the getaway car in her vehicle and assisted officers in locating the Toyota as they responded to the robbery alert.

As officers approached the Montanos' getaway vehicle on the highway, the driver began maneuvering erratically. According to Payne's statement to officers after the chase, Montano actively urged her to evade the police as they were being pursued. He demanded she "go, go" and "just fucking drive." He also told her he was on parole and did not want to return to prison. Payne informed police that Montano

3

gave her specific advice about how to elude the authorities as she drove. After several miles of high-speed chase that involved weaving through traffic and illegally crossing the highway median multiple times, police successfully deployed spike strips to stop the car. When the vehicle came to a halt, Montano and his father quickly exited and unsuccessfully attempted to carjack two nearby automobiles before being apprehended.

### b.  Procedural History

Montano and his father were indicted for Hobbs Act robbery in violation of 18 U.S.C. § 1951. Montano pleaded guilty to the charge without a plea agreement. The United States Probation Office prepared a Presentence Investigation Report ("PSR") which applied two sentencing guidelines enhancements: (a) a three-level increase to the offense level for possession or brandishing a weapon under § 2B3.1(b)(2)(E); and (b) a two-level adjustment under § 3C1.2 for recklessly creating a substantial risk of death or serious bodily injury to another person in the course of fleeing law enforcement. The brandishing-based increase in offense level was predicated on evidence Montano obscured his hand in his sweatshirt to create the appearance of a firearm. *See* U.S.S.G. § 2B3.1 cmt. n.2 (providing § 2B3.1(b)(2)(E) covers objects used "in a manner that create[] the impression that the object was an instrument capable of inflicting death"). The endangerment adjustment was based on evidence Montano induced Payne into driving recklessly in the getaway vehicle. *See id.* § 3C1.2 cmt. n.5 (applying the guideline to conduct the defendant "aided or abetted, counseled, commanded, induced, procured, or willfully caused").

4

The district court adopted both §§ 2B3.1(b)(2)(E) and 3C1.2. It determined the clerk's testimony regarding Montano's placement of his hands during the robbery and evidence of his forceful demands substantiated the brandishing guideline's application. Similarly, given the nature of the offense, Payne's statement to police, and her hazardous driving, the district court concluded the record supported the application of the reckless endangerment adjustment.

In calculating Montano's criminal history category, the district court considered two prior state court judgments involving crimes committed between 2016 and 2017. Only the criminal history points assessed for the sentences imposed in the first of these two judgments (the "December 2017 Judgment") are at issue in this appeal.[1] The December 2017 Judgment consolidated five New Mexico state cases which resolved thirteen charges. Two of the cases resolved in the December 2017 Judgment involve convictions for only a single crime: CR 2017-01101 (unlawful taking of a motor vehicle) and CR 2017-03304 (conspiracy to commit auto burglary). Both of these crimes are fourth degree felony offenses subject to a maximum term of eighteen months' imprisonment. The other three cases resolved in the December 2017 Judgment involve multiple charges with total terms of imprisonment of three,

---

[1] The second judgment (the "May 2018 Judgment") imposes a sentence of six years' imprisonment to be served concurrently with the sentence imposed in the December 2017 Judgment. The district court's criminal history calculation attributed the maximum possible three points to this six-year sentence of imprisonment pursuant to U.S.S.G. § 4A1.1(a). Montano does not challenge this determination.

four, and twelve years respectively.[2] [Id.] The state court imposed the maximum possible sentence on each of the thirteen criminal convictions resolved in the December 2017 Judgment:[3] a total sentence of one day less than twenty-two years' imprisonment.[4] Nevertheless, it suspended all but seven years of that term. The state court did not allocate any part of the unsuspended seven-year sentence to any one of

---

[2] CR 2017-03303 resolved the following two charges: receiving or transferring a stolen vehicle (a fourth degree felony) and aggravated fleeing a law enforcement officer (a fourth degree felony). The total possible maximum sentence available in CR 2017-03303, assuming both sentences were ordered to run consecutively, is three years' imprisonment. CR 2017-01385 resolved the following three charges: receiving or transferring a stolen vehicle (a fourth degree felony); conspiracy to commit receiving or transferring a stolen vehicle (a fourth degree felony); and resisting, evading, or obstructing an officer (a misdemeanor). The total possible maximum sentence available in CR 2017-01385, assuming all three sentences were ordered to run consecutively, is four years' imprisonment. CR 2017-01217 resolved the following six charges: residential burglary (a third degree felony); conspiracy to commit residential burglary (a fourth degree felony); larceny of at least $2501, but no more than $20,000 (a third degree felony); two counts of larceny of a firearm (each fourth degree felonies); and receiving or transferring a stolen vehicle (a fourth degree felony). The total possible maximum sentence available in CR 2017-01217, assuming all six sentences were ordered to run consecutively, is twelve years' imprisonment.

[3] The December 2017 Judgment lists the thirteen crimes for which consecutive sentences are imposed in the following order: (1) the single crime set out in CR 2017-01101, which occurred on or about February 14, 2017; (2) the six crimes set out in CR 2017-01217, which occurred on or about December 8, 2016; (3) the three crimes set out in CR 2017-01385, which occurred on or about March 28, 2017; (4) the two charges set out in CR 2017-03303, which occurred on or about August 27, 2017; and (5) the single crime set out in CR 2017-03304, which occurred on or about October 3, 2017.

[4] Presumably, the one-day-less-than-twenty-two-years aspect of the sentence is meant to account for the single misdemeanor conviction resolved in CR 2017-01385. *See* N.M. Stat Ann. § 31-19-1 (providing that the maximum sentence for any misdemeanor is imprisonment "for a definite term less than one year").

the five consolidated cases or thirteen sentenced convictions.[5] Instead, the dispositive

paragraph of the state court judgment simply states as follows:

> The convictions shall be served consecutively for all purposes including any future parole/probation violations for an overall jurisdiction of twenty-two (22) years minus one (1) day. All but seven (7) years will be suspended, for an actual term of seven (7) years in the New Mexico Department of Corrections. Thirteen (13) years and one-hundred and eighty-one (181) days of the sentence shall be suspended and the defendant will be placed on five (5) years of supervised probation. One (1) year and one-hundred and eighty-three (183) days will be suspended without condition.

R. at 58.

Pursuant to U.S.S.G. § 4A1.1, previous convictions receive criminal history

points weighted according to the length of actual imprisonment. Three criminal

history points are allocated for sentences of imprisonment exceeding thirteen months;

two points for sentences of at least sixty days; and one point for sentences under sixty

days. U.S.S.G. § 4A1.1(a)–(c). The PSR recommended allocation of the maximum

three criminal history points to each of the five consolidated cases regardless of the

maximum possible sentences for the crimes charged in each of the five cases. In total,

the PSR assessed Montano twenty points,[6] which resulted in a criminal history

---

[5] The absence of allocation of the unsuspended sentence to any of the five cases is unremarkable. The parties have not furnished, and this court has not found, any New Mexico case, statute, or regulation that contemplates, expects, or requires such allocation. New Mexico courts generally have discretion to suspend or partially suspend sentences. *See* N.M. Stat. Ann. § 31-20-3; *State v. Sinyard*, 675 P.2d 426, 428–29 (N.M. App. 1983).

[6] This total calculation includes three criminal history points deriving from the May 2018 Judgment, *see supra* n.1., as well as two points because Montano

category of VI. *See* U.S.S.G. Ch 5 Pt. A (noting that category VI includes any defendant with thirteen or more criminal history points).

The district court reached the same conclusion as the PSR in calculating criminal history points under § 4A1.1(a), resulting in a criminal history category of VI. In analyzing the issue, the district court determined:

> Looking through each of these cases, they involved threat in one way or another, burglary, larceny, that type of thing. The Court must assume that it was the intent of the State Court for the defendant to spend time in custody on each of these cases and not cut off by going in order, as the defense has suggested, after you have reached [7 years] and spend no time after that for any of the cases after that, that are listed, if I'm making any sense, in this Amended Judgment and Partial Sentence. That is reasonable, and I believe the preponderance of the evidence supports that.
>
> . . . .
>
> And if you give each case 18 months, that is three, six, seven and a half, that's somebody serving time, a little bit of time for each one. I just think it is supported, and I think that makes reasonable sense that the Court intended the defendant to spend time in custody for each of the cases.

R. at 262–63.

The district court then adopted the PSR's recommendation and assigned Montano to criminal history category VI. After applying all relevant sentencing enhancements and deductions, the district court calculated Montano's offense level to be twenty-two points, which resulted in a sentencing guideline range of 84 to 105 months.

---

committed the PCS Store robbery while under supervised probation, *see* U.S.S.G. § 4A1.1(d) (2021). Montano does not challenge either of these determinations.

Montano was ultimately sentenced to ninety-six months' imprisonment, followed by three years of supervised release.

### III.   Analysis

#### a.  Standard of Review

"When evaluating the district court's interpretation and application of the Sentencing Guidelines, we review legal questions de novo and factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts." *United States v. Zamora*, 97 F.4th 1202, 1207–08 (10th Cir. 2024) (quotation omitted). Whether the facts found by the district court are sufficient to warrant an enhancement is reviewed de novo. *United States v. Martinez*, 602 F.3d 1156, 1158 (10th Cir. 2010). "The government bears the burden of proving sentencing enhancements by a preponderance of the evidence." *United States v. Orr*, 567 F.3d 610, 614 (10th Cir. 2009). Similarly, the government generally has the burden of showing "facts necessary to justify the addition of criminal history points" by a preponderance of the evidence. *United States v. Randall*, 472 F.3d 763, 766 n.1 (10th Cir. 2006); *see also United States v. Servin-Acosta*, 534 F.3d 1362, 1365 (10th Cir. 2008) ("The sentencing court may find that the defendant has a prior conviction if it is satisfied by a preponderance of the evidence.").

#### b.  Brandishing Enhancement

This court has clearly held that "a concealed hand may be an object which potentially triggers the three-level enhancement under § 2B3.1(b)(2)(E)." *United States v. Farrow*, 277 F.3d 1260, 1268 (10th Cir. 2002). We have been careful,

9

however, to ensure that "innocent conduct is not punished due solely to potentially unreasonable perceptions of particular victims." *Id*. Thus, when analyzing the applicability of § 2B3.1(b)(2)(E) to an object, this court evaluates the witness's subjective state of mind but does not consider it determinative. *Id*. Instead, we look to whether "'a reasonable person, under the circumstances of the robbery, would have regarded the object that the defendant brandished, displayed or possessed as a dangerous weapon.'" *Id*. (quoting *United States v. Hart*, 226 F.3d 602, 607 (7th Cir. 2000)).

*Farrow* considered a bank teller's report that the defendant placed his hand in his pocket to mimic a gun while conducting a robbery. 277 F.3d at 1268. When he approached the bank counter, the defendant told the teller, "give me all the money, set it on the counter" and "don't try anything funny. Don't make a scene or I'll do something reckless." *Id*. at 1261–62. Although the district court considered the teller's subjective observations in concluding the brandishing enhancement should apply, we determined the district court adequately considered other evidence in reaching its conclusion. *Id*. at 1268. Specifically, the district court "applied the three-level enhancement to Mr. Farrow based on his actions and language at the scene, which included demands for money and threats." *Id*. Additionally, the district court appropriately considered evidence that the defendant told investigators he had strategically positioned his hand in his pocket to give the appearance of possessing a firearm. *Id*. Under these facts, this court was "satisf[ied] . . . that the district court

10

assessed the evidence in light of the proper standard and that its findings were not based solely on the victim's subjective perception." *Id.*

Here, Montano conducted himself similarly to the defendant in *Farrow*. The district court found he was credibly seen obscuring his hand to create the appearance of a weapon and he made forceful, directive comments in the context of stealing thousands of dollars' worth of goods. The record reflects the district court relied on the totality of the circumstances in reaching its determination and there is nothing to suggest the factual assertions underlying the district court's analysis were clearly erroneous. The district court here did not have the benefit of an express admission by the defendant, as was present in *Farrow*. Nonetheless, such evidence is not required for a court to apply the proper, objective standard. *Id.* Rather, courts must consider the perceptions of a reasonable observer under the circumstances, which can be informed simply by the "actions and language" of the defendant during the event. *Id.*; *see also United States v. Tate*, 999 F.3d 374, 384 (6th Cir. 2021) ("Through [defendant's] menacing words coupled with using his hand and his shoulder bag, a 'reasonable individual' would believe that [the defendant] had a weapon . . . ."); *United States v. Davis*, 635 F.3d 1222, 1227 (D.C. Cir. 2011) (noting the defendants' demands for money; nervous demeanor; and motion to reach into a bag sufficiently corroborated a witness's impression that the defendant possessed a weapon during the robbery); *United States v. Maxwell*, 90 F. App'x 305, 307 (10th Cir. 2004) (when analyzing § 2B3.1(b)(2)(E) "the district court . . . properly considered the entire context, including the timing of the movement of his hand to his pocket . . . , its

duration . . . , and his potentially threatening words") (unpublished disposition cited only for its persuasive value).[7] Given the employee's observations, the context of the robbery, and Montano's forceful threats to limit the clerks' movements, we conclude a reasonable person under these circumstances would have regarded his hand to be a dangerous weapon and the ensuing enhancement was properly applied.

### c. Reckless Endangerment Enhancement

Section 3C1.2 contemplates a sentencing adjustment for reckless endangerment caused not only by a defendant's personal actions fleeing from authorities, but also conduct of others the defendant "aided or abetted, counseled, commanded, induced, procured, or willfully caused." U.S.S.G. § 3C1.2 cmt. n.5. In turn, this court has held that a defendant who is merely a passenger in a getaway vehicle can be responsible for the reckless actions of the driver. *See United States v. Wilfong*, 475 F.3d 1214, 1220 (10th Cir. 2007); *United States v. Conley*, 131 F.3d 1387, 1391 (10th Cir. 1997).

---

[7] Montano argues many cases evaluating analogous applications of § 2B3.1(b)(2)(E) consider statements from the defendant to witnesses that either (a) expressly state the obscured hand or object is a weapon; or (b) threaten explicit harm. *See e.g.*, *Tate*, 999 F.3d at 384; *United States v. Stitman*, 472 F.3d 983, 986 (7th Cir. 2007). He contends his own statements fell short of these types of claims and, therefore, precedent does not support that a reasonable person would have interpreted he brandished a weapon. Certainly, such evidence is compelling in analyzing whether § 2B3.1(b)(2)(E) applies. Similar facts, however, are not necessary to satisfy the objective standard. As explained above, evidence of threating statements, demands, and actions can substantiate brandishing without an express admission from the defendant or graphic threat of harm. *See Farrow*, 277 F.3d at 1268.

12

In *United States v. Conley*, this court considered a defendant who was a passenger in a getaway car subject to a high-speed chase similar to the one in this case. 131 F.3d at 1391. There, we recognized that "[t]he behavior of the car is not, in and of itself, a sufficient basis for a finding that Appellants procured the driver's reckless behavior." *Id*. Without evidence of what happened in the car during the chase, this court concluded that "the defendant's conduct prior to the [crime]" was relevant for determining if he encouraged the reckless action. *Id*. We determined several aspects of the defendant's behavior could support the application of a § 3C1.2 enhancement, including: (a) "conscious[]" planning for a robbery which required a quick escape; and (b) committing such a crime, thereby supplying motive to abscond. *Id*.; *see also Wilfong*, 475 F.3d at 1220 (noting that defendant's attempt to destroy evidence by throwing it out of the getaway car window as a passenger helped to substantiate defendant's role as "an active participant in the chase" for purposes of § 3C1.2).[8]

---

[8] In his appellate briefing, Montano attempts to factually distinguish *Conley*. Unlike here, in *Conley* (a) the defendants had guns and the driver did not, thereby creating a possibility of greater control over the driver; (b) the road conditions were icy and particularly dangerous; and (c) the defendants conceded they were trying to outrun the authorities. 131 F.3d at 1391. Although the presence of these facts contributes to a finding that § 3C1.2 applies, none are mandatory. *See*, *e.g.*, *Wilfong*, 475 F.3d at 1220. As noted in *Conley*, several factors inform whether the defendant induced recklessness. Many of these factors were present here, such as the nature of the driving, the timing of getaway, and the content of the crime. 131 F.3d at 1391. Additionally, the case at hand also involves compelling evidence of what occurred inside the vehicle during the chase, which reflects Montano's direct role in the reckless getaway.

Here, there is no doubt that the vehicle was driven recklessly. *See United States v. Brown*, 314 F.3d 1216, 1221 (10th Cir. 2003) (explaining "reckless" for purposes of § 3C1.2 as being aware of and disregarding risk constituting a gross deviation from the standard of care expected of a reasonable person). Payne violated several traffic laws in an attempt to elude officers and jeopardized the safety of other drivers over the course of several miles. Similar to *Conley*, Montano's conduct prior to and after the chase indicates motive to quickly escape authorities. He planned and committed a crime that required enlisting the services of a getaway driver to make a speedy departure from the scene. Montano and his father further underscored the urgency of their flight by attempting to carjack multiple vehicles after their own getaway vehicle was disabled.

Unlike *Conley*, this case includes additional contemporaneous evidence from inside the car which implicates Montano's role in encouraging the reckless driving. Payne's statement to police emphasized Montano's entreaty to drive quickly and his express efforts to direct her navigation. Montano argues Payne's statement was merely hearsay that cannot sufficiently establish his actions inside the vehicle. Hearsay statements, however, "may be considered at sentencing if they bear some minimal indicia of reliability." *United States v. Damato*, 672 F.3d 832, 847 (10th Cir. 2012); *see also* U.S.S.G. § 6A1.3(a). Several facts lend credibility to Payne's statement, including that her report was given in-person so the officer could assess her demeanor; her statement was self-inculpatory; and she implicated both father and son, rather than just shifting the blame onto Montano. *See Damato*, 672 F.3d at 847;

14

*United States v. Smalls*, 605 F.3d 765, 781 (10th Cir. 2010); *United States v. Cook*, 550 F.3d 1292, 1297 (10th Cir. 2008).[9] Accordingly, we perceive no error in the district court's reliance on her statement in analyzing the application of § 3C1.2. Even if Payne's report was not properly considered, however, enough evidence exists of Montano's conduct surrounding the crime to support the enhancement. *Conley*, 131 F.3d at 1391. In light of Montano's conscious efforts to execute a robbery, the clearly dangerous nature of the car chase, and Payne's corroborating statement, we are convinced the government carried its burden to show the § 3C1.2 enhancement applied and comprehend no clear error in the district court's factual findings underlying that conclusion.

### d. Criminal History Calculation

Section 4A1.1 assigns criminal history points based on the length of imprisonment term imposed on prior criminal convictions. Convictions with

---

[9] Montano argues Payne's statements do not meet this minimal bar for reliability. He analogizes these facts to those in *United States v. Fennell*, 65 F.3d 812 (10th Cir. 1995), which determined that an unsworn statement to a probation officer was not reliable enough to support an enhancement under U.S.S.G. § 2K2.1(b)(5). The statement in *Fennell*, however, was made telephonically "by an unobserved witness" and was "unsupported by other evidence." *Id*. at 813–14. Here, that is not the case. As explained above, Payne's statement was made more reliable by her in-person recitation, self-inculpatory acknowledgement, and lack of blame-shifting. As was true in *Conley*, Montano's inducement of reckless driving was also supported by his need to escape quickly. *See generally United States v. Ruby*, 706 F.3d 1221, 1229 (10th Cir. 2013) ("Corroborating evidence is often key to determining whether a statement is sufficiently reliable."). Finally, the record does not support the argument that Payne's statement exclusively and unfairly pinned blame on Montano. In fact, her statement of the conduct inside the car also contributed to her boyfriend Daniel receiving a § 3C1.2 enhancement at sentencing.

associated sentences of imprisonment exceeding thirteen months receive the

maximum allotment of three points; convictions associated with shorter sentences

receive as little as one point if the sentence falls below sixty days. U.S.S.G.

§ 4A1.1(a)–(c). The narrow question on appeal is whether the district court erred in

allocating fifteen criminal history points to the five cases resolved in the December

2017 Judgment.[10] To recapitulate, the December 2017 Judgment resolved five

consolidated cases, each of which involved convictions for crimes such as burglary,

larceny, and stolen vehicle offenses. The December 2017 Judgment imposed a

statutory maximum sentence of almost twenty-two years' imprisonment, but

suspended all but seven of those years.[11] The December 2017 Judgment does not

indicate whether or what part of the seven-year unsuspended sentence was

attributable to any of the five particular cases or thirteen separate convictions.[12] *But*

*cf. United States v. Cruz-Alcala*, 338 F.3d 1194, 1199 (10th Cir. 2003) (noting that

the sentencing court clearly underscored how much prison time was included in a

suspended sentence for purposes of § 4A1.1 analysis). The unsuspended sentence

simply represented the total prison time to be served for the five consolidated cases.

---

[10] As noted above, Montano does not challenge the three criminal history points the district court allocated to the May 2018 Judgment or the two criminal history category points the district court allocated pursuant to U.S.S.G. § 4A1.1(d) (2021). *See supra* nn. 1, 6.

[11] Under § 4A1.2(b)(2), "[i]f part of a sentence of imprisonment was suspended, 'sentence of imprisonment' refers only to the portion that was not suspended."

[12] *See supra* n.5 and corresponding text.

16

The PSR recommended, and the government argued, that each of the five cases resolved in the December 2017 Judgment should be allocated the maximum three criminal history points. The only evidence offered to support such an approach was the December 2017 Judgment itself, along with the factual recitations of the underlying convictions in the PSR. In its analysis of Montano's criminal history calculation, the district court began by criticizing the state court's judgment.[13] It then interpreted the judgment, emphasizing that each of the five cases involved a "threat in one way or another, burglary, larceny, that type of thing." In turn, it concluded the preponderance of the evidence supported the assumption "it was the intent of the State Court for the defendant to spend time in custody on each of these cases." In accordance with the PSR, the district court proceeded to attribute eighteen months' imprisonment to each of the five consolidated cases. This resulted in twenty criminal history points, three from the May 2018 Judgment, two from § 4A1.1(d) (2021), and fifteen from the December 2017 Judgment, thereby supporting a criminal history category of VI.

On appeal, the government broadly argues the district court properly interpreted the state court judgment as intending to allocate prison time to each case

---

[13] The district court characterized the state court's judgment as "appalling" and "a mess." In doing so, it apparently expected the state court to specify what portion of the seven-year sentence applied to each of the five consolidated cases. Such criticism is off the mark. *See supra* n.5. State court judges impose sentences in accordance with their own jurisdiction's requirements and not necessarily in anticipation for how their sentences might be considered in another jurisdiction.

17

because the underlying offenses involved "threats" and were, therefore, not minor.[14] Rather than endorsing the district court's approach to allocate eighteen months' imprisonment to each case,[15] however, the government proposes an alternate theory of allocation supporting a criminal history category of VI. It notes that the seven-year unsuspended sentence is roughly 32% of the full twenty-two-year sentence. Applying this ratio to proportionally reduce the maximum sentence in each of the consolidated state cases similarly results in criminal history category VI.[16]

---

[14] The government's adoption of this aspect of the district court's analysis is inapt for several reasons. First, the government does not identify any aspect of Chapter Four of the sentencing guidelines that utilizes the perceived severity of prior crimes to illuminate how the state court intended to "pronounce[]" the punishments covered by the partial sentence. U.S.S.G. § 4A1.2 cmt. n.2 (clarifying definition of "sentence of imprisonment" for purposes of § 4A1.1). Furthermore, the government does not identify what is meant by "threat." Black's Law Dictionary defines "threat" as a "communicated intent to inflict harm or loss on another or on another's property [in a way] that might diminish a person's freedom to act voluntarily." *Black's Law Dictionary* 1618 (9th ed. 2009); *see also State v. Fernandez*, 875 P.2d 1104, 1110–11 (N.M. Ct. App. 1994) (using Black's definition of "threat" to give content to elements of witness intimidation statute). There is no indication in the record that any of the thirteen crimes of conviction involved this type of actual "threat." If the government or district court meant to use the term as a proxy for the issue of danger, it does so without explanation or discussion. In any event, this court's reading of the PSR indicates only two of thirteen crimes set out in two different consolidated cases involved specific danger to a person or persons: the residential burglary charged in CR 2017-01217 and the aggravated fleeing from an officer charged in CR 2017-03303. In asserting the contrary, the government, like the district court is inaccurate.

[15] The government concedes it "is not certain what the district court meant" when it indiscriminately allocated eighteen months for each of the five state court cases.

[16] This methodology allocates two criminal history points for three of the consolidated state cases and three points for the remaining two for a total of twelve points. When added to Montano's second state court sentence and his two points for committing the violation while on probation, the resulting criminal history calculation well-exceeds the thirteen points required for category VI.

Montano argues the government has failed to demonstrate each of the consolidated cases merit three criminal history points and, therefore, has failed to meet its burden of proof. *See Randall*, 472 F.3d at 766 n.1. He proposes a third alternative allocation theory which results in a criminal history category of V. He advocates allocating all seven years of the unsuspended sentence to the most serious of the five cases, which had a maximum sentence of twelve years' imprisonment.[17] Accordingly, he suggests this case receive three criminal history points and the remaining four cases receive one point. When added to his other criminal history points, the total criminal history calculation amounts to twelve points and a corresponding category of V.

This court is thus presented with three different theories projecting the possible intent of the state court in sentencing Montano: two result in category VI, and one results in category V. Each method allocates criminal history points to each of the five consolidated cases. Each of the theories also present a potentially plausible basis to allocate time of imprisonment. The evidence presented does not indicate any methodology is weightier than the others and to pick one would be speculative. As demonstrated by the district court's unsupported assumptions at

---

[17] This case was the most expansive. It contained six counts, twice that of the next most serious case, and included three out of four of Montano's larceny and burglary charges. *See supra* n.2.

sentencing, there is not sufficient evidence to determine the intent of the state court.[18]

Merely because the state court judgment does not inform the allocation of time of

imprisonment to any of the five cases, the government is not relieved of its burden to

justify the imposition of the higher criminal history category.[19] The government,

---

[18] The government affirmatively asserts that resolution of this question is factual in nature. Gov't Response Br. at 22. This court accepts the government's concession, making it unnecessary to decide whether interpretation of an ambiguous state court judgment involves a legal or factual question. *See Truman v. Johnson*, 60 F.4th 1267, 1273 n.6 (10th Cir. 2023) (noting that, in the preclusion context, the circuits are split as to this question).

[19] This court perceives an additional interpretation of the December 2017 Judgment not advanced by either party. Relevant state law and analysis of the state court's intent drawn from the face of the document support the conclusion that a total of six criminal history points should be attributed to the December 2017 Judgment. As described above, see supra nn. 1–6, the December 2017 Judgment imposes sentences on the thirteen separate convictions set out in five consolidated cases. It does not impose sentences on the five consolidated cases themselves. The December 2017 Judgment imposes the statutory maximum sentence on each conviction and orders all thirteen sentences to run "consecutively for all purposes including any future parole/probation violations." Of the total nearly twenty-two-year sentence, all but seven years are suspended. Of the remaining nearly fifteen years, all but one-and-one-half years are suspended with the condition Montano serve a five-year term of supervised probation.

The New Mexico sentencing scheme is discussed at length in *United States v. Jones*, 921 F.3d 932, 939–42 (10th Cir. 2019) and *State v. Kenneman*, 653 P.2d 170, 172–74 (N.M. Ct. App. 1982). As those cases and the statutory citations therein make clear, suspended portions of sentences have meaningful existence post-judgment. *Kenneman*, 653 P.2d at 172 ("In the case of suspension, if probation is revoked, the court may require the defendant to serve the balance of the sentence previously imposed but suspended, or any lesser sentence."); N.M. Stat. Ann. § 31-20-8 ("Whenever the period of suspension expires without revocation of the order, the defendant is relieved of any obligations imposed on him by the order of the court and has satisfied his criminal liability for the crime. He shall thereupon be entitled to a certificate from the court . . . and upon presenting the same to the governor, the defendant may . . . be granted a pardon or a certificate restoring such person to full rights of citizenship."). Notably, New Mexico state courts can only impose a period

therefore, has failed to meet its burden and we conclude Montano's appropriate

criminal history category to be V.[20]

### IV.    Conclusion

The sentence imposed by the District Court for the District of New Mexico is

hereby affirmed in part and reversed in part. The matter is remanded to the district

---

of probation by first suspending a portion of a sentence of incarceration. *Jones*, 921 F.3d at 940. This court has not discovered any New Mexico law indicating any reason to apportion a partially suspended sentence among different convictions or among multiple incidents resolved in a single judgment. Given the continuing validity of the entirety of the twenty-two-year sentence imposed in the December 2017 Judgment, it is reasonable to read the judgment as sequentially suspending all sentences imposed after the running of seven years. *Cf*. N.M. Stat. Ann. 31-20-5 ("If a defendant is required to serve a period of probation subsequent to a period of incarceration . . . the period of probation shall be served subsequent to any required period of parole, with the time served on parole credited as time served on the period of probation and the conditions of probation imposed by the court deemed as additional conditions of parole . . . .").

Under this theory, Montano would receive three points for the first sentence imposed in the December 2017 Judgment; an eighteen-month sentence for unlawful taking of a motor vehicle. He would also receive three points for the next sentence imposed; a three-year term for residential burglary. He would not receive any points for the next three sentences imposed because those sentences involved crimes that occurred on the same day, were charged in the same indictment, and were imposed on the same day as the burglary. U.S.S.G. § 4A1.2(a)(2). Each of the consecutive sentences imposed thereafter in the judgment would be suspended and, thus, do not count as a sentence of imprisonment. *Id*. § 4A1.2(b)(2). When added to the five points not contested by Montano, these six points result in a total of eleven criminal history points and a criminal history category V.

[20] In the alternative, Montano argues that the rule of lenity should apply. In light of our disposition remanding for a lesser criminal history category, we need not address this issue.

21

court to vacate Montano's sentence and to resentence him consistent with the holding

of this disposition.[21]

---

[21] At oral argument, the government requested a new evidentiary hearing on remand. "Although remand for resentencing generally allows the district court to conduct de novo review," this court may exercise its discretion to limit remand to the existing record under certain circumstances. *United States v. Forsythe*, 437 F.3d 960, 963 (10th Cir. 2005). It is appropriate to exercise such discretion when the "Defendant alerted the government to the deficiency in its evidence, [and] the government did not seek to cure the deficiency." *Id*. (quotation omitted). Here, Montano consistently objected to the lack of evidence supporting his criminal history calculation under § 4A1.1 and the government failed to offer any additional evidence supporting its contention. Accordingly, "[t]he government failed to meet its burden of proof on a clearly established element . . . and we decline to give it a second bite at the apple." *Id*.